IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FREDERICK JACKSON, ASHLEY NICOLE JACKSON, a minor, BRIANA FREDRANIQUE ANNETTE JACKSON, a minor, and SHAWNA YVETTE MARTIN,

Plaintiffs,

v.

CITY OF PITTSBURG, AARON L. BAKER, individually and in his official capacity as Chief of Police of the City of Pittsburg Police Department, G. LOMBARDI, individually and as an officer of the City of Pittsburg Police Department (Badge # 275), C. SMITH, individually and as an officer of the City of Pittsburg Police Department (Badge # 285), P. DUMPA, individually and as an officer of the City of Pittsburg Police Department (Bade # 291), WILLIAM BLAKE HATCHER, individually and as an officer of the City of Pittsburg Police Department (Badge # 274), SARA SPIRES, individually and as an officer of the City of Pittsburg Police Department, and DOES 1–100, inclusive,

Defendants.
                                                  /

No. C 09-01016 WHA

**ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this civil rights action, defendants move for summary judgment. Their motion is **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

This action arises from a police action on March 30, 2008, in front of the residence of plaintiff Shawna Martin in Pittsburg, California. The following facts are uncontroverted. Plaintiff Frederick Jackson resided next door to plaintiff Martin. Plaintiffs Ashley Jackson and

Briana Jackson are Frederick Jackson's two minor teenage daughters (Lagos Decl. Exh. A at 9–10). During the evening of March 30, a party was held at the adjacent residences of plaintiffs Jackson and Martin (Rooney Decl. Exh A at 52–53). A fight broke out between two party-goers, Barryton "Chip" Davis and Ron Martin, Jr. (*id.* at 63). Martin hit Davis in the head with a bottle and knocked him unconscious (Rooney Decl. Exh. B at 54). Plaintiff Frederick Jackson then chased Martin down the street (Rooney Decl. Exh. A at 63). Plaintiff Frederick Jackson and Martin shouted at each other, and Frederick Jackson kicked and broke a window on Martin's car (*id.* at 64, 96).

Neighborhood visitor Cynthia Gutierrez called the police (Rooney Decl. Exh. O at 42). Officers from the Pittsburg Police Department responded to the emergency call to their dispatch (Rooney Decl. Exh F at 15). The dispatcher told them that two men were fighting and reported to the responding officers that there was a "man down" and a shirtless African-American male possibly armed with a knife (*ibid.*; Rooney Decl. Exh. I at 11).

The first officers to arrive at the scene were Officer Hatcher and Sergeant Brown (Rooney Decl. Exh. E at 14–15). They requested immediate cover (Rooney Decl. Exh. I at 91). Officer Brown was holding his shotgun and Sergeant Brown was holding his handgun (*ibid.*). Officer Dumpa arrived next, followed by Officers Buck, Spires, Smith and Lombardi (Lagos Decl. Exh H at 6). Sergeant Brown was the supervising officer in charge at the scene.

It is undisputed that plaintiff Frederick Jackson was the only shirtless African-American male on the scene when the officers arrived. The parties differ in their accounts of what follows, but at this stage of the litigation, the facts are considered in the light most favorable to the non-moving party. *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005). When the officers arrived, they encountered at least nine people in the vicinity of the Jackson and Martin residences. At her deposition, plaintiff Ashley Jackson identified at least herself, Frederick Jackson, Briana Jackson, Danielle Lynch, Shawna Martin in the front yard area, as well as the injured Chip Davis who was still lying on the sidewalk (Lagos Decl. Exh. B at 40). Porchia Payton was also outside in the front yard area of the residences (Lagos Decl. Exh. E at 71), as

was Cynthia Gutierrez (Lagos Decl. Exh. F at 56). Plaintiff Shawna Martin testified at her deposition that her mother was also outside (Lagos Decl. Exh. D at 83).

Plaintiff Frederick Jackson testified at his deposition that when he saw that one of the officers had a shotgun, he immediately threw up his hands (Lagos Decl. Exh. A at 74). The officer told him not to move and to keep his hands up (*ibid.*). He responded, "Man, I'm not going to move. My hands is up. I ain't got nothin'. I ain't did nothin'" (*ibid.*). He also stated, "Man, y'all watch him, man. He look like he gonna try to shoot a nigger" (*ibid.*).

At that point, plaintiff Ashley Jackson started screaming, "Don't y'all do nothin' to my daddy. Don't ya'll hurt my daddy. Don't do nothin' to my daddy. My daddy ain't did nothin'" (*id.* at 75). According to plaintiff Frederick Jackson, his daughter Ashley kept screaming (*ibid.*)

According to plaintiff Shawna Martin, after the police told everyone to put up their hands, she put her hands up but kept yelling (Lagos Decl. Exh. D at 82). She yelled for people to "[j]ust shut up and calm down," because everyone in the vicinity was yelling (*ibid.*). Plaintiff Martin also continued to argue with her mom, who was telling her to be quiet (*ibid.*).

At that point, one of the officers told plaintiff Ashley Jackson to "shut the fuck up" (Lagos Decl. Exh. A at 75). Plaintiff Frederick Jackson became really upset when the officer used profanity with his daughter (*id.* at 86). With his hands still in the air and not moving, he stated to the officer, "Man, you don't tell my daughter to shut the fuck up. You shut the fuck up, okay?" (*id.* at 75–76). Officer Hatcher attempted to put handcuffs on plaintiff Frederick Jackson (Lagos Decl. Exh. B at 52). The officer put plaintiff Frederick Jackson's left hand behind his back, while his right hand was behind his head (*id.* at 52–53). Another officer moved in front of plaintiff Frederick Jackson and said, "Well, didn't my partner tell you to shut the fuck up. If you don't shut the fuck up, I'm gonna taze you" (Lagos Decl. Exh. A at 75, 87). Plaintiff Frederick Jackson responded by saying, "Well, fuck you, too" (*id.* at 75).

In trying to put handcuffs on plaintiff Frederick Jackson, Officer Hatcher attempted to move him in order for him to turn. At that point, according to plaintiff Frederick Jackson's deposition testimony, plaintiff's body inadvertently "probably either nudged [Officer Hatcher] or something" (*id.* at 83–84).

3

Officers Lombardi, Smith and Dumpa then discharged their tasers at plaintiff Frederick Jackson (Rooney Decl. Exh. F at 33, 112, 115; Exh. G at 46–47, 50, 61; Exh. H at 27, 40). Plaintiff was standing up on two feet when he was first tased (Lagos Decl. Exh. B at 53). When he was hit by the first taser, he immediately folded up and fell face first to the sidewalk (Lagos Decl. Exh. A at 87–88, 95). Plaintiff felt the first taser from the front, then felt an additional taser from behind and started flapping harder (*id.* at 88).

Each time a taser was fired, it discharged electricity for a five second cycle (Lagos Decl. Exh. M at 18). Dataport downloads of the taser devices indicate when and how many times each taser was discharged, but not the order in which the officers tasered plaintiff because the tasers' internal clocks were not correlated to each other in true time (Lagos Decl. Exh. Q). Officer Dumpa discharged her taser once. Officer Lombardi discharged his taser once in the air and once into plaintiff. Officer Smith discharged his taser twice into plaintiff, with a delay of six seconds between each five-second cycle (*ibid*). In summary, plaintiff was tased a total of four times: the first three times in quick succession by Officers Dumpa, Lombardi and Smith, and then once more by Officer Smith after a delay of six seconds.

Police officers ordered the crowd to stay back, calm down and be quiet (Lagos Decl. Exh. B at 86). Plaintiff Shawna Martin admitted at her deposition that she was "disobeying the female officer's [Spires] commands" by continuing to argue with her mother (Rooney Decl. Exh. B at 121). She was subsequently handcuffed and placed in a police car by Officer Spires, which she admitted that she "deserved" (*ibid*.). She stated at her deposition that she did not "have any dispute or argument with the fact that [she was] handcuffed and placed in a police car that evening" (*id.* at 122). The handcuffs, however, were placed on her "really, really tight" (*id.* at 96). She stated that she did not, however, suffer any physical injuries (*id.* at 116).

Despite police commands to be quiet, plaintiff Ashley Jackson cried and said, "Why did you all tase my daddy. He didn't do nothing" (Lagos Decl. Exh. B at 58) and "What the fuck are you doing with my daddy, he didn't do shit" (Lagos Decl. Exh. D at 96). One of the police officers took her to a police car and threw her on the car (Lagos Decl. Exh. B at 58–59). She

4

1  was then handcuffed and detained (not arrested) for interfering with the police officers'
2  performance of their duties (*ibid.*; Lagos Decl. Exh. D at 88).

3  Plaintiff Frederick Jackson was subsequently arrested for resisting arrest and battery on
4  a police officer (Rooney Decl. Exh. E at 61, Exh. B at 116, Exh. D at 83). According to
5  plaintiff Martin, plaintiff Frederick Jackson was slammed against the window of the police car
6  in which she was detained (Rooney Decl. Exh. D at 101).

7  Plaintiff Briana Jackson was not detained or touched by police officers during the March
8  30 incident (Lagos Decl. Exh. P at 76). She witnessed the tasering and arrest of her father and
9  the detention of her sister and plaintiff Martin.

10 Sometime within a week or so of the March 30 incident, plaintiff Frederick Jackson and
11 plaintiff Briana Jackson's cousin were parked in a car across the street from their home and
12 were approached by the same police officer who during the March 30 incident had used
13 profanities with plaintiffs and who had tased plaintiff Frederick Jackson. The officer said that
14 they could not park there (Lagos Decl. Exh. C at 92). Plaintiff Frederick Jackson disagreed that
15 they could not park there, and said to the police officer, "What, you going to try and tase me
16 again?" (*ibid.*). The officer replied, "umm, well, I can do it again" (*ibid.*). Following this
17 incident, police officers started driving by every other day and making comments to plaintiffs
18 (*id.* at 98).

19                              *        *        *

20 Plaintiffs' first amended complaint contains twelve claims, including (1) violation of
21 civil rights under California Civil Code § 52.1 against all defendants, (2) violation of civil rights
22 under California Civil Code § 51.7 against all defendants, (3) battery against defendants
23 Lombardi, Smith, Dumpa, Hather and Spires, (4) intentional infliction of emotional distress
24 against all defendants, (5) negligence against all defendants, (6) negligence per se against
25 defendants City of Pittsburg, Lombardi, Smith, Dumpa, Hatcher and Spires, (7) negligent
26 selection, training, retention supervision, investigation and discipline against defendants City of
27 Pittsburg and Baker, (8) respondeat superior against defendant City of Pittsburg, (9) violation of
28 42 U.S.C. 1983 and 28 U.S.C. 1343 against all individual defendants, (10) injunctive and

declaratory relief pursuant to *Monell* against defendant City of Pittsburg, (11) false imprisonment and false arrest against defendants Lombardi and Spires, and (12) conspiracy against all defendants. In their opposition to defendants' motion for summary judgment, plaintiffs withdraw their sixth claim (for negligence per se) (Opp. at 17).

**ANALYSIS**

Summary judgment must be granted under FRCP 56 when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A district court must determine, viewing the evidence in the lights most favorable to the nonmoving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007). A genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

**1.     SECTIONS 52.1 AND 1983.**

Plaintiffs' first claim alleges that the individual defendants used excessive force in detaining them. It is brought under California Civil Code §52.1, which allows relief "against anyone who interferes, or tries to do so, by threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured by federal or state law." *Jones v. Kmart Corp.*, 17 Cal.4th 329, 331 (1998). Because the elements of plaintiffs' Civil Code §52.1 excessive force claim are essentially identical to those of their ninth claim brought under 42 U.S.C. 1983, the discussion of a plaintiff's federal constitutional claim resolves both the federal and state constitutional claims.

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). *First*, the gravity of the particular intrusion on Fourth Amendment interests is assessed by evaluating the type and amount of force

6

inflicted. *Second*, the importance of the government interest at stakes is evaluated, " including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ibid.* "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . ." *Id.* at 396–97. "In some cases . . . the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." *Smith v. City of Hemet*, 349 F.3d 689, 701 (9th Cir. 1994). *Third*, the gravity of the intrusion is weighed against the government's interest to determine whether the force used was constitutionally reasonable. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003).

### A. Multiple Taserings Of Plaintiff Frederick Jackson.

The type and amount of force inflicted during the March 30 incident was greatest against plaintiff Frederick Jackson, who was tasered by three officers nearly simultaneously. The Ninth Circuit has previously held that use of a taser "was a serious intrusion into the core of the interests protected by the Fourth Amendment: the right to be secure in our persons." *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir. 2010).

In *Mattos*, two officers were dispatched to a home after a fourteen year old minor called the police and said that her parents were engaged in a physical altercation and things were being thrown around. *Id.* at 1084. When the officers arrived, they encountered the husband, a six-foot-three-inch tall man weighing approximately 200 pounds — intoxicated. The husband admitted that he and his wife had argued by denied they had gotten physical. The officers and the husband stepped inside the doorway of the home, and the wife became situated between the officers and her husband. The husband then became agitated, asked the officers to leave, and began yelling profanities at them. One of the officers entered the hallway to arrest the husband. The wife asked one of the officers why her husband was being arrested and asked that the officers and her husband calm down. She "raised her hands, palms forward at her chest, to keep [the officer] from flushing his body against hers." *Id.* at 1085. The officer immediately stepped

7

back and asked if she was touching an officer. The wife again asked everyone to calm down. At that moment, she was tased by the officer. *Ibid.*

Reversing the district court, the Ninth Circuit held that "[i]n this heated situation, [the officer's] deployment of a Taser did not violate [the wife's] constitutional rights" and granted summary judgment on her excessive force claim. *Id.* at 1089. In assessing the importance of the government's stake at issue, the Ninth Circuit held that the safety of the police officers was "the most important" factor to consider. *Id.* at 1088. Although the wife's actions were not a serious crime, the Ninth Circuit found that they carried the potential for a far more serious crime due to her husband's intoxicated state, the close quarters, the threat posed by the husband to the officers, the volatility of situations involving domestic violence, and the interference she caused — even if inadvertent — to the officers' ability to arrest her husband. *Ibid.*

The present action is distinguishable from *Mattos* on several grounds. *First*, unlike *Mattos*, the present action is not a domestic violence dispute. The Ninth Circuit emphasized in *Mattos* that "the volatility of situations involving domestic violence makes them particularly dangerous. . . . Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Ibid.* The element of domestic violence in *Mattos* therefore raised the risk of immediate threat to the safety of the officers in a way that is not applicable to the present action.

*Second*, the Ninth Circuit emphasized that the officers in *Mattos* used the taser "only once." *Id.* at 1090. In the present action, by contrast, plaintiff Frederick Jackson was tased four times. The fourth tasering was administered by Officer Smith after a six second delay, when plaintiff was already lying face first on the sidewalk and had been tased three times. In these circumstances, there is at least a genuine issue of material fact whether any threat to the officers from plaintiff Frederick Jackson and others present, the severity of plaintiff Frederick Jackson's crime, and the magnitude of his resistance justified being tased so many times.

*Third*, the plaintiff in *Mattos* admitted that she raised her hands palms forward at her chest to keep an officer from pushing flush against her. In the present circumstance, plaintiff Frederick Jackson stated that, at most, he inadvertently nudged an officer when the officer

8

moved plaintiff's arms to handcuff him. He claimed that he was otherwise stationary with his hands over his head.

It is true that he directed profanities and loud criticisms at the police officers for their treatment of his daughter Ashley, but "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Houston v. Hill,* 482 U.S. 451, 461 (1987). In *Houston v. Hill*, the appellee shouted at police officers who had approached his friend to "pick on somebody your own size." *Id.* at 454. The Supreme Court held that the Constitution does not allow such speech to be made a crime. *Id.* at 462–63. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63. Even though the police may dislike being the object of abusive language, they are not allowed to punish individuals for conduct that is not only lawful, but which is protected by the First Amendment. *Duran*, 904 F.2d at 1378. In these circumstances, a reasonable jury could find that the multiple tasing was excessive force.

The doctrine of qualified immunity shields the officers from liability for civil damages unless their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if "it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (emphasis in original). An officer will therefore be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable." *Id.* at 955. In the present circumstances, a genuine issue of material fact existed as to whether defendant officers' belief in the legality of tasering plaintiff so many times was reasonable under the circumstances, precluding summary judgment on ground of qualified immunity. At the least, whether the officers may be said to have made a "reasonable mistake" of fact or law may depend on the jury's resolution of disputed facts regarding the tasering incident.

9

Accordingly, defendants' motion for summary judgment on plaintiff Frederick Jackson's first and ninth claims for excessive force arising out of his tasering is **DENIED**.

### B. Other Constitutional Rights Claims.

Both plaintiffs Ashley Jackson and Martin were detained for interfering with the police officers' performance of their duties. Plaintiff Martin admitted that she continued to argue with her mother despite police orders to stay back, calm down, and be quiet. California Penal Code Section 148 proscribes resisting, delaying, or obstructing a police officer. She herself stated that she did not contest her detention. Nevertheless she complains that the handcuffs placed upon her were painfully tight, causing a bruise over an approximate half-inch area on her right wrist (Lagos Decl. Exh. D at 123).

The Ninth Circuit has held that overly tight handcuffs may constitute excessive force. *Meredith v. Erath*, 342 F.3d 1057, 1063-64 (9th Cir.2003). Taking the facts in the light most favorable to plaintiff Martin, a reasonable jury could find that the officers used an unreasonable amount of force in handcuffing her and as a result violated her Fourth Amendment rights. Although plaintiff Martin was disobeying the officers' commands to be quiet, she did not resist the handcuffing and the need for force was minimal at best. When these events occurred, it was clearly established that the amount of force plaintiff Martin says was used in handcuffing her was excessive, and a reasonable agent would have known that such conduct violated the Fourth Amendment. *See, e.g., Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989) ("[T]he officers used excess force on Hansen by unreasonably injuring her wrist and arm as they handcuffed her."). Defendants are therefore not entitled to qualified immunity on summary judgment as to plaintiff Martin's excessive force claim.

Plaintiff Ashley Jackson was also detained for disobeying the police after being told to stay back, calm down, and be quiet. Plaintiff Ashley Jackson's disobedience primarily involved criticizing the police for detaining and tasering her father. As noted above, such speech cannot be criminalized. *Houston,* 482 U.S. at 462–653 (1987). *Id.* at 462–63. It is true that the police may interfere with personal autonomy if such action is reasonably calculated to promote public safety, but they require legitimate, articulate reasons to do so. *Duran*, 904 F.2d at 1377. A

10

reasonable jury could find that the officers did not have such reasons here when they detained plaintiff Jackson.

Plaintiffs Frederick and Ashley Jackson claim that excessive force was used against them because they were each "slammed" against police cars while not resisting the police. Force is justified only when there is a need for it. *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir.2007). At a minimum, factual disputes exist regarding both the level of force that the officers used when placing plaintiffs into the police cars as well as their compliance. Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could conclude that the officers used excessive force by slamming plaintiffs against police cars. This constitutional violation was clearly established at the time of the March 30 incident, so the officers would not be entitled to qualified immunity. Defendants' motion for summary judgment on claims one and nine with regards to plaintiffs Shawna Martin and Frederick and Ashley Jackson is therefore **DENIED**.

Plaintiff Briana Jackson does not point to any evidence that she was ever touched by police. Accordingly, she cannot be the victim of excessive force and defendants' motion for summary judgment on claims one and nine as to her is **GRANTED**.

**2.    SECTION 51.7.**

Plaintiffs' second claim is for violation of California Civil Code § 51.7. The elements of a Section 51.7 claim are that (1) defendant threatened or committed violent acts against plaintiff, (2) defendant was motivated by his perception of plaintiff's sex, color, race, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation,, (3) plaintiff was harmed, and (4) defendant's conduct was a substantial factor in causing plaintiff's harm. *Austin B. v. Escondido Union School District* 149 Cal.App.4th 860, 880–881. In *Austin B.*, the California Court of Appeal affirmed the trial court's entry of nonsuit on a Section 51.7 claim where plaintiffs did not point to any evidence creating even an inference that the defendant's motivation in harming plaintiffs was his perception of their protected status. *Ibid.*

Plaintiffs' first amended complaint asserts that defendants were motivated here by racial prejudice against plaintiffs who are African American. Nevertheless, as in *Austin B.*, plaintiffs

11

do not point to any evidence in opposition to defendants' motion for summary judgment that could create an inference that defendants' motivation in harming plaintiffs was defendants' perception of plaintiffs' race. Accordingly, defendants' motion for summary judgment on plaintiffs' second claim is **GRANTED**.

**3.     BATTERY.**

Plaintiffs' third claim is for battery. California Penal Code § 835(a) entitles an arresting or detaining police officer to "use reasonable force to effect the arrest, to prevent escape or to overcome resistance." A police officer does not commit battery unless unreasonable force is used. *Saman v. Robbins*, 173 F.3d 1150, 1157, fn. 6 (9th Cir. 1999).

Because no evidence shows that Briana Jackson was touched by police officers, defendants' motion for summary judgment on plaintiffs' third claim as to her is **GRANTED**.

As discussed above, a reasonable jury could conclude that the use of multiple tasers on plaintiff Frederick Jackson, too-tight handcuffs on plaintiff Shawna Martin, and the slamming of plaintiffs Frederick and Ashley Jackson into police cars constituted unreasonable force. Defendants' motion for summary judgment on plaintiffs' third claim as to Shawna Martin and Frederick and Ashley Jackson is therefore **DENIED**.

**4.     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

Plaintiffs' fourth claim is for intentional infliction of emotional distress. The elements of the tort of intentional infliction of emotional distress are: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Christensen v. Superior Court*, 54 Cal.3d 868, 903 (9th. Cir. 1991). For conduct to be outrageous, it must "be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Ibid.*

Plaintiffs Frederick and Ashley Jackson may pursue claims for intentional infliction of emotional distress for allegedly being "slammed" by officers onto police cars. Plaintiff Shawna Martin may pursue a claim based on too-tight handcuffs. Plaintiff Frederick Jackson may

12

pursue a claim based on multiple tasings. As to those claims, defendants' motion for summary judgment as to claim four is **DENIED**. It is otherwise **GRANTED**.

### 5. NEGLIGENCE.

Plaintiffs' fifth claim is for negligence. Plaintiffs offer several grounds upon which they make this claim. *First*, they argue that defendants were negligent by offensively and non-consensually touching them. Plaintiffs may pursue this claim as it relates to their contention that defendant officers "slammed" plaintiffs Frederick and Ashley Jackson onto police cars, put too-tight handcuffs on plaintiff Shawna Martin, and tasered plaintiff Frederick Jackson multiple times. Defendants' motion for summary judgment on claim five as to this ground is **DENIED.**

*Second*, plaintiffs argue that defendants were negligent by falsely arresting or imprisoning them. Because it cannot be held as a matter of law that plaintiffs were lawfully arrested and/or detained, as explained above, defendants' motion for summary judgment on claim five as to this ground is **DENIED.**

*Third*, plaintiffs argue that defendants were negligent by lying in the reporting of the March 30 incident and conspiring with and wrongfully aiding other defendants in either arresting/battering plaintiff Frederick Jackson, and/or falsely imprisoning/battering the other plaintiffs. In particular, plaintiffs note that the City of Pittsburg Police Department's written handcuff policy states that when an individual is handcuffed and released without an arrest, a written report of the incident shall be made to document the details of the detention and the need for use of handcuffs (Lagos Decl. Exh X at 142). Nevertheless, the incident reports regarding the March 30 incident do not mention the detentions of plaintiffs Ashley Jackson or Shawna Martin (Lagos Decl. Exh. T). In the light most favorable to plaintiffs, this omission from the police report regarding plaintiffs Ashley Jackson and Shawna Martin could be interpreted by a jury as negligence in light of their claim for excessive force. Defendants' motion for summary judgment on claim five as to this ground is **DENIED.**

### 6. NEGLIGENT SELECTION, TRAINING, RETENTION AND SUPERVISION.

Plaintiffs' seventh claim is for negligent selection, training, retention and supervision against defendant City of Pittsburg and defendant Baker as the chief of police of the Pittsburg

Police Department. A municipality may not be held liable under Section 1983 solely because it employs a tortfeasor, *see, e.g., Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978). Instead, plaintiffs must identify a municipal "policy" or "custom" that caused the injury. Plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *Monell*, 436 U.S. at 694. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

The inadequacy of police training may serve as the basis for Section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton v. Harris*, 489 U.S. 379, 388 (1989). Only where a failure to train reflects a "deliberate" or "conscious" choice by the municipality can the failure be properly thought of as an actionable city "policy." Moreover, the identified deficiency in the training program must be closely related to the ultimate injury. Thus, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs.

Plaintiffs claim that defendants are liable due to the inadequacy of police training for several reasons. *First*, although the Pittsburg Police Department has policies that require that officers not be disrespectful and discourteous to citizens, it does not have a written policy on the express use of insulting or profane language (Lagos Decl. Exh. O at 26, 39). Plaintiffs argue that the March 30 incident escalated "because and as a direct result of the profanities by the officers" (Opp. at 18).

Considering the March 30 incident in the light most favorable to plaintiffs, the officers' use of profanities with plaintiff Ashley Jackson escalated and even precipitated the confrontation with plaintiff Frederick Jackson that led to his arrest and her detention.

*Second*, plaintiffs argue that the absence of an official investigation into the March 30 incident by defendant Baker or the City of Pittsburg Police Department regarding the actions of defendant officers at the scene reveals inadequacy of police training. This arguably could show

14

continued adherence to an approach that defendants knew or should have known had failed to prevent tortious conduct by police officers.

*Third*, plaintiffs cite several claims by other individuals against Pittsburg police officers, which they argue show that defendant City has a strong disinclination to discipline or investigate the behavior of its police officers.

Given the number of profanities uttered by the officers during the March 30 incident, at least according to plaintiffs, it is possible that a jury could reasonably infer the existence of a pattern of tortious conduct by inadequately trained employees and a lack of proper training to support this claim. Accordingly, defendants' motion for summary judgment on claim seven is **DENIED**.

Plaintiffs' tenth claim is for injunctive and declaratory relief under *Monell*. Plaintiffs seek to compel defendant City of Pittsburg to adopt new training policies. This claim is closely related to plaintiffs' seventh claim, and for the same reasons, defendants' motion for summary judgment on claim ten is **DENIED**.

**7.     RESPONDEAT SUPERIOR.**

Plaintiffs' eighth claim is for respondeat superior liability against defendant City of Pittsburg for the deprivation of plaintiffs' constitutional rights by the individual defendants. But a city cannot be held liable for a violation of constitutional rights on a theory of respondeat superior. *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 889 (9th Cir. 1990). Accordingly, defendants' motion for summary judgment on claim eight is **GRANTED**.

**8.     FALSE IMPRISONMENT/FALSE ARREST.**

Plaintiffs' eleventh claim alleges that defendants Lombardi and Spires falsely imprisoned or arrested plaintiffs Frederick Jackson and Martin. As noted above, plaintiff Martin admitted that she continued to argue with her mother despite police orders to stay back, calm down, and be quiet, and stated during her deposition that she did not contest that she did not contest her detention (Lagos Decl. Exh. D at 121–22):

>    Q:    Do you think you deserved to be handcuffed and placed in
>          a police car that evening?

15

> A: Yes.
>
> Q: So I take it then you don't have any dispute or argument with the fact that you were handcuffed and placed in a police car that evening.
>
> A: No, I don't.
>
> . . . . .
>
> Q: And just to follow up on your testimony from a moment ago, you feel that the reason why you deserved to be handcuffed and placed in the police car is because you were disobeying the female officer's commands?
>
> A: Yeah, that's the only reason.

Even accepting plaintiffs' version of events, plaintiff Martin's actions by disobeying the officers' commands and continuing to argue with her mother while the police were attempting to secure the crowded, chaotic scene justified her detention. Defendants' motion for summary judgment on plaintiffs' eleventh claim as to plaintiff Martin is therefore **GRANTED**.

As to plaintiff Frederick Jackson, however, it cannot be stated as a matter of law on the facts described above that the officers had probable cause to arrest him for battery on a police officer and resisting arrest. A reasonable jury could conclude that any contact he had with the officer who was attempting to handcuff him was inadvertent or was caused by the officer himself. A reasonable jury could also conclude that plaintiff Jackson did not resist arrest. Defendants' motion for summary judgment on plaintiffs' eleventh claim as to plaintiff Frederick Jackson is therefore **DENIED**.

**9. CONSPIRACY.**

Plaintiffs' twelfth claim is for conspiracy. According to their opposition to defendants' motion for summary judgment, they seek to assert a claim for civil conspiracy under California common law (Opp. at 24). A conspiracy is a combination of two or more persons to accomplish by concerted action a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means. The gravamen of a claim for civil conspiracy consists of "(1) the formation and

16

operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts." *Ahrens v. Superior Court*, 197 Cal.App.3d 1134, 1150 (1988). As to the first element, a plaintiff is entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose. Furthermore, the requisite concurrence and knowledge "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Ibid.*

Plaintiffs' conspiracy claim here is predicated on their allegations that defendants agreed and acted (a) to intentionally falsely arrest and/or imprison plaintiffs, (b) to intentionally fabricate and contrive the charges lodged against plaintiff Frederick Jackson, (c) to intentionally submit false police reports, statements, and testimony to support and corroborate the fabricated charges lodged against plaintiffs, (d) to use force that was excessive and to intimidate and terrorize plaintiffs Frederick and Ashley Jackson and Martin, (e) to punish plaintiff Frederick Jackson for having exercised his right to freedom of speech, and (f) to discriminate against plaintiffs based on their race by fabricating criminal charges used as mere pretext to provide color for plaintiff Frederick Jackson's arrest and the use of excessive force (Complaint ¶ 70).

As noted above, the detention of plaintiff Martin was not contrary to law. Nor have plaintiffs produced any evidence that support an inference that defendants' actions were motivated by race.

Plaintiffs argue that a conspiracy may be inferred in this matter from the fact that no officer objected to the conduct engaged in by any of the other officers, including the supervisor Sergeant Brown (Opp. at 24). The failure of the incident reports to record, as required by Pittsburg Police Department handcuff rules, the detentions of plaintiffs Ashley Jackson or Martin could be interpreted by a jury as evidence of a conspiracy to cover up alleged wrongdoing stemming from the March 30 incident.

Accordingly, defendants' motion for summary judgment on claim twelve is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs may attempt to show that the other individual defendants conspired to cover up the other claims of wrongdoing remaining in this action.

**CONCLUSION**

Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** as described above.

**IT IS SO ORDERED.**

Dated: June 8, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE