United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FREDERICK JACKSON, ASHLEY NICOLE
JACKSON, and BRIANA FREDRANIQUE
ANNETTE JACKSON,

    Plaintiffs,

  v.

GERALD VINCENT LOMBARDI, individually
and as an officer of the City of Pittsburg Police
Department (Badge # 275), CORY LEE SMITH,
individually and as an officer of the City of
Pittsburg Police Department (Badge # 285),
SANKARA REDDY DUMPA, individually and as
an officer of the City of Pittsburg Police
Department (Badge # 291), WILLIAM BLAKE
HATCHER, individually and as an officer of the
City of Pittsburg Police Department (Badge # 274),

    Defendants.

No. C 09-01016 WHA

**ORDER GRANTING IN
PART AND DENYING IN
PART DEFENDANTS'
RENEWED MOTION
FOR JUDGMENT AS A
MATTER OF LAW OR
FOR A NEW TRIAL**

## INTRODUCTION

Judgment was entered against most of the defendants after a jury trial. Defendants then filed a renewed motion for judgment as a matter of law or in the alternative for a new trial. For the reasons stated below, the motion is **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

This Section 1983 action arose from an incident on March 30, 2008, in which police tased plaintiff Frederick Jackson multiple times. The facts have been discussed elsewhere and thus need not be repeated (*see* Dkt. No. 119).

The jury found that Officers Cory Lee Smith, Sankara Reddy Dumpa, and Gerald Vincent Lombardi used excessive force against plaintiff Frederick Jackson in violation of the Fourth Amendment, and that Officer Lombardi tased him in retaliation for using speech protected by the First Amendment (Dkt. No. 208). Judgment was entered in favor of plaintiff Jackson and jointly and severally in the amount of $250,000.00 against Officers Smith, Dumpa, and Lombardi. The jury awarded punitive damages against Officers Smith, Dumpa, and Lombardi in the respective amounts of $6,500.00, $2,500.00, and $7,500.00.

Now up for decision is a renewed motion for judgment as a matter of law or in the alternative for a new trial. This order must decide: (1) whether Officers Smith, Dumpa, and Lombardi are entitled to qualified immunity from the judgment against them as a matter of law, (2) whether the punitive damages assessed against them by the jury were improper, and (3) whether a new trial should be granted due to alleged juror misconduct.

**ANALYSIS**

A renewed motion for judgment as a matter of law can only be granted as to a particular issue if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50. In ruling on such motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**A.     QUALIFIED IMMUNITY**

The jury found that Officers Smith, Dumpa, and Lombardi violated plaintiff's Fourth Amendment rights, and that Officer Lombardi violated his First Amendment rights. This order will proceed with qualified immunity analysis separately for each jury finding.

**1.     Fourth Amendment Violation**

Defendants are entitled to qualified immunity if "a reasonable officer in [their] position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances [they] confronted." *Bryan v. MacPherson*, 608 F.3d 614, 629 (9th Cir. 2010). A

2

reasonable mistake of law can occur where a constitutional right is not clearly established. *See Pearson v. Callahan*, 129 S.Ct. 808, 816 (2009).

Defendants raise *Bryan v. MacPherson*, which was decided less than one month before this case went to trial (and was not raised in the summary judgment motion, although the general issue of qualified immunity was raised). *Bryan* also concerned the discharge of a taser gun — in that case Officer MacPherson tased Bryan once, which caused Bryan to fall face first into the ground, fracture four teeth and suffer facial contusions. The court of appeals held that the force used by Officer MacPherson was constitutionally excessive. But it also held that Officer MacPherson was entitled to qualified immunity, because "as of July 24, 2005, there was no Supreme Court decision or decision of our court addressing whether the use of a taser . . . in dart mode constituted an intermediate level of force." *Id.* at 629. The court of appeals has thus only this year determined that the discharge of a taser gun can amount to excessive force, such that a reasonable officer could be aware of clearly established law on the matter. *See also Mattos v. Agarano*, 590 F.3d 1082, 1090 (9th Cir. 2010). Plaintiff cites nothing to the contrary.

In opposition, plaintiff concentrates on the excessive force part. Based on *Bryan*, however, this order is compelled to find that qualified immunity covers all of the excessive force claims and that part of the judgment must be vacated, subject to reinstatement if the court of appeals views *Bryan* differently.

### 2. First Amendment Violation

Apart from the Fourth Amendment violation, the jury separately found that Officer Lombardi "tased [plaintiff] in retaliation for using speech protected by the First Amendment" (Dkt. No. 208). Regardless of defendants' entitlement to qualified immunity for their Fourth Amendment violations, whether Officer Lombardi is entitled to qualified immunity for his First Amendment violation is an independent inquiry. Defendants argue, "[w]ith no evidentiary support whatsoever . . . plaintiff proposes that the tasers were used by the officers 'in retaliation for the exercise of . . . freedom of speech'" (Reply 7). Defendants treat the First Amendment recovery as a mere back-up theory concocted by plaintiff in opposition to the instant motion.

3

This is ridiculous. The First Amendment claim was expressly litigated and expressly ruled on by the jury.

> Defense counsel cites and quotes from the *Dietrich* decision to the effect that:
>
>> To demonstrate retaliation in violation of the First Amendment, [Plaintiff] must ultimately prove first that [Defendants] took action that would chill or silence a person of ordinary firmness from future First Amendment activities. . . . The second requirement is [that] . . . [Plaintiff] must ultimately prove that [Defendants'] desire to cause the chilling effect was a but-for cause of [Defendants'] action.

*Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900–01 (9th Cir. 2008) (brackets and ellipses in original) (citation omitted). Putting aside the fact that the trial evidence would have supported findings under this theory as well, the most important point is that no one requested an instruction on the point of "chilling." At the charging conference, the parties discussed the addition of Ninth Circuit civil model jury instruction 9.10, concerning the First Amendment claim, to the charge to the jury. Defendants objected to use of the word "action" — instead of the phrase "unlawful action" — to refer to the alleged retaliatory action of defendants (*see also* Dkt. No. 163 at 10). No other objection was made to this instruction and no modifications or supplements were requested. Model jury instruction 9.10 was therefore directly adapted into jury instruction 24, which stated:

> In this case, there is also a First Amendment claim. Plaintiff Frederick Jackson alleges defendants Lombardi, Smith, Dumpa and/or Hatcher deprived him of his rights under the First Amendment to the Constitution when he objected to the conduct of defendants.
>
> Under the First Amendment, a citizen has the right to free expression. In order to prove defendants Lombardi, Smith, Dumpa and/or Hatcher deprived plaintiff Frederick Jackson of his First Amendment right, plaintiff must prove the following additional elements by a preponderance of the evidence:
>
> 1. Plaintiff Frederick Jackson engaged in speech protected under the First Amendment, and
> 2. In retaliation for such protected speech, defendants Lombardi, Smith, Dumpa and/or Hatcher tased, slammed or arrested plaintiff.

(Dkt. No. 196.) Prior to the charging conference, counsel were alerted that "counsel must, at the charging conference, bring to the judge's attention any additions, subtractions or modifications or other objections or proposals for the jury instructions . . . Otherwise, all such points shall be deemed waived and it will not be sufficient merely to argue after the verdict that a proposed

4

instruction filed earlier in the proceedings somehow was not adopted" (Dkt. No. 191; *see also* Dkt. No. 223 at 45:14–46:8).

Although defense counsel's silence on this point at the charging conference is dispositive, no proposed instruction based upon *Dietrich* was even tendered at any point prior to the verdict. Once the instructions are settled and the verdict is in, neither side is free to raise new points of law. All that may be raised are old points of law, that is, proposed instructions and objections timely presented to the trial judge before the jury charge was finalized. After the verdict all that matters is the law as stated in the final charge and any points of law timely presented at or before the charging conference. Other points of law are inadmissible. This is why Rule 50 motions need only be decided by reference to the final charge to the jury and why a Rule 50 motion is no occasion to rush to the law library in hope of finding some nice legal theory that should have been raised long before. Otherwise, the trial judge will be criticized by the losing side for an error he or she was never given a chance to correct.

Officer Lombardi is not entitled to qualified immunity for violating plaintiff's First Amendment rights, because a reasonable officer in his position could not have made a reasonable mistake of law concerning the retaliatory use of a taser gun. This part of the verdict must stand.

**B.    PUNITIVE DAMAGES**

Defendants assert that punitive damages are unjustified, either as a matter of fact or law. It is axiomatic that "[t]here can be no punitive damages where compensatory damages have not been awarded." *Deland v. Old Republic Life Ins. Co.*, 758 F.2d 1331, 1339 n.4 (9th Cir. 1985). Punitive damages are therefore unjustified as a matter of law as to plaintiff's Fourth Amendment claims, as defendants are entitled to qualified immunity for those claims.

That leaves consideration of Officer Lombardi's First Amendment violation. Concerning punitive damages, the special verdict form stated: "If you have answered 'yes' to any of Questions 1 and 2 [the liability questions], state whether plaintiffs have proven by a preponderance of the evidence that punitive damages should be awarded against any officer you find violated *any Fourth Amendment rights*" (emphasis added). The jury checked "yes" for Officers Lombardi, Smith, and Dumpa (Dkt. No. 208). The Court regrets that the First

5

1  Amendment was not also referenced. It should have been. Plaintiff's counsel should have
2  pointed out the omission and it would have been corrected, but he did not. Counsel did not object
3  to or mention the phrasing of this question at the charging conference. Again, the parties were
4  admonished that they had to raise any objection to the proposed jury instructions presented at the
5  charging conference to preserve the point (*see* Dkt. No. 223 at 45:14–46:8). Punitive damages
6  were therefore not awarded for the First Amendment violation by Officer Lombardi. All punitive
7  damages were awarded solely for the Fourth Amendment violations and must fall away with the
8  Fourth Amendment qualified immunity.

### C. JUROR MISCONDUCT

Finally, defendants move for a new trial because of juror misconduct. Defendants argue that Juror Darcy Padilla was biased against defendants, and withheld that fact during jury voir dire. As evidence in support of their motion they offer several unsworn statements by two other jurors that discuss Ms. Padilla, as well as six declarations by police officers and defense counsel, who spoke with Ms. Padilla after the conclusion of trial, concerning her statements.[1]

By way of explanatory background for the court of appeals, it has been the undersigned's practice to allow jurors to meet with counsel (and the parties who remain) in the courtroom after the trial to educate counsel as to tips for the next trial in their careers. The judge is absent. Jurors are told they can so meet if they wish or are free to return home immediately. Often jurors do meet with counsel, as occurred here, although plaintiffs and plaintiffs' counsel were evidently gone. In eleven years of service by the undersigned, this is the first case in which counsel have used the opportunity to try to impeach the verdict.

Juror Padilla was one of the jurors who stayed behind to discuss the case. Defendants now point to statements of disbelief by Ms. Padilla at that session to the effect of "why did you keep me on the jury?" (Edrington Decl. 2). Such a question proves little. Counsel had every opportunity to ask any questions it wanted of any and all of the potential jurors during jury voir

---

[1] Apart from the declarations and exhibits submitted in support of their opening brief, defendants filed one additional unsworn juror statement two days before oral argument on their motion. Though this submission was certainly untimely, it was considered, but it adds no new information to that which was previously submitted.

6

1  dire (*see* Dkt. No. 222). This order will now review relevant portions of voir dire pertaining to
2  Ms. Padilla and counsel's opportunity to ask questions, so that it is clear that defense counsel had
3  every opportunity to gather more information or strike Ms. Padilla based on the information it
4  had:

> 69:25–70:23 [Ms. Padilla]: Hi. Darcy Padilla. San Francisco. College degree. Self-employed. I'm a photojournalist. Several clubs: National Association of Hispanic Journalists and National Press Photographers' Association. Hobbies would be reading and cooking. Marital status is single. My partner's occupation is self-employed business development. No children. I've been called many times for jury. Never selected. Never been in the military or law enforcement. And I have had a bankruptcy, so that was about seven years ago. . . . I have had my own business for about 20 years. I work for people like Newsweek, The New Yorker, New York Times. I have an agent in New York.
>
> 76:6–12 [the Court]: This case involves the use of taser guns. Do any of you have any strong opinions about taser guns? If so, raise your hand. It could be a good opinion, a bad opinion. I just want to know do you have any strong opinions about taser guns? Please raise your hand. (Thereupon, the jury panel responded negatively.)
>
> 79:4–12 [the Court]: Have any of you ever had — any of you ever had any experience with taser guns? If so raise your hand. All right. No one is raising their hand. Have any of you ever had a particularly good or particularly bad experience with police officers? If so, raise your hand. Okay. There's one hand. Ms. Whittington. . . .
>
> 82:3–10 [the Court]: Any of you ever been in trouble, either you or one of your close loved ones? Your partner or somebody that is close to you ever been in trouble with the law? And I can have a side bar to hear you out privately if the answer to that is "yes." But if so, raise your hand. Okay. Mr. Conner . . .
>
> 107:1–3 [the Court]: Okay. I'm going to let the lawyers now ask a few minutes worth of questions to all of the — all of the prospective members of the jury.
>
> 110:15–18 [defense counsel]: If a police officer — and the Court has already addressed this, but if a police officer and a citizen give two very different recitations of an event, would any of you tend to favor the testimony of the citizen over the police officer? [no responses indicated]
>
> 112:12–113:20: [implicit in the record that Ms. Padilla indicates she would like to address the Court]
> Ms. Padilla: I just thought that the Court should know my father was an investigator for the public defender's office in Solano County. . . . He retired about five years [sic], but . . . that's not going to harbor my . . .
> The Court: And did you ever talk with him about individual cases?
> Ms. Padilla: Oh, yes. Yes.
> The Court: So you probably learned some things from him about how the system works.
> Ms. Padilla: Yes.

7

> The Court: Okay. Well, still, do you think that that will cause you to be biased one way or the other in this case?
> Ms. Padilla: No, I don't think it would cause me to be biased. I just think it's important you know.
> The Court: You're doing a good thing bringing this up. But do I have your word that you'll put all that to one side and decide this case on the merits?
> Ms. Padilla: Yes.
> The Court: Very good. Thank you. Do any of you want to follow-up with what Ms. Padilla just said?
> Plaintiffs' counsel: No, Your Honor.
> Defense counsel: No, Your Honor.

No challenge for cause was made and Ms. Padilla was not struck by peremptory challenge by either party.

In support of their instant motion, defendants primarily argue that there was juror misconduct because Ms. Padilla supposedly lied by omission on voir dire. The evidence presented includes the following: (1) Juror Mercedeh Oliver wrote a letter to defense counsel, which she signed under the following incomprehensible statement: "I declare this report to be my true [sic] and nothing by the truth statement [sic] under penalty of perjury under oath. I am competent to testify" (Exh. C to Edrington Decl.). In it, she stated in part that:

> Ms. Padilla "was telling everybody about how she was beaten up by her ex-boyfriend's ex girlfriend [sic] . . . the police or the FBI could not find [the ex-girlfriend]. . . . She also said that the police was [sic] called by her on her neighbors who were fighting but that the officers always got it wrong and came to her door thinking that it was her and her boyfriend fighting. 'The police wouldn't do anything, they can't do anything right,' she said."

(2) Officer Spires stated that after the end of trial, "Juror Padilla informed me (and the others who were present during this conversation) that she had been pepper-sprayed approximately '100 times' in one day in Chile . . . [and] that she had been 'hit with batons'" (Spires Decl.). This is the extent of evidence submitted concerning Juror Padilla's "particularly bad" past experiences with police.

To obtain a new trial based on juror misconduct, the moving party "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). To determine whether the first prong of this standard is met, "[a] court confronted with a colorable claim of juror bias must

8

undertake an investigation of the relevant facts and circumstances." *Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir. 1998).

The evidence presented by defendants does not meet either standard. Let's assume that Ms. Padilla contacted police to find her ex-boyfriend's ex-girlfriend and they couldn't. And let's further assume that when Ms. Padilla called the police on her neighbors, they came to her door instead. Was it a lie for Juror Padilla not to raise her hand to describe these items when the panel was asked if anyone had had a "particularly good" or "particularly bad" episode with officers? In the context of this case, the panel could easily have understood the question to deal with a possible police violation of the venire-person's rights, not an episode where the police simply went to the wrong door. The same goes for the alleged Chilean incident, as the question concerning police could have very easily been understood to concern police in our own country.

Defendants also assert statements by Ms. Padilla, and the other two jurors to whom defense counsel purportedly spoke, concerning the jury's reasoning in reaching the verdict that it did, as well as Ms. Padilla's reaction to several hypothetical situations and whether she thought they would constitute excessive force. At oral argument, defense counsel stated that he wants to depose members of the jury on these issues. That type of evidence is improper and will not be considered, however, because a jury verdict cannot be impeached based on jury statements of what went on in the jury room. Fed. R. Evid. 606(b).

No doubt, Juror Padilla proved to be a leader on the jury and she formed a highly negative view of the police conduct in question. That, however, was within the allowable scope of juror conduct. If she was able to persuade all of the others to acquiesce in her view of the case, then so be it — that is the way our jury system works.

Jury verdicts must be accorded great deference. *See City Solutions, Inc. v. Clear Channel Commc'ns, Inc.*, 365 F.3d 835, 840–41 (9th Cir. 2004). Defendants have not presented a colorable claim that Ms. Padilla was biased and failed to answer honestly a material question on voir dire. Defense counsel was given every opportunity to ask more questions on voir dire, ask Ms. Padilla follow-up questions when she volunteered facially pro-plaintiff background information, or strike her with one of its peremptory challenges. It was only after the jury

9

returned with a verdict for plaintiff that defendants complained. Defense counsel wishes, he says, to depose all members of the jury to find out about their jury deliberations. This is beyond the pale. Jurors should not be subjected to such after-the-fact recriminations by the losing side, at least without a more powerful showing than has been made here.[2] Defendants are not entitled to a new trial because of juror misconduct.

### D. "EVIDENTIARY ISSUES"

Lastly, defendants seem to move for a new trial because "[s]imply, plaintiffs and their witnesses were not credible" (Br. 18). In this short section of their brief, defendants solely present issues of fact. The trial evidence was adequate to find that Officer Lombardi tased plaintiff in retaliation for his verbal criticism of the way the officers were handling the situation. True, the overall evidence would have supported the opposite verdict as well. Evidence is to be weighed by the jury. A new trial is not warranted on this ground.

### CONCLUSION

For the reasons stated, defendants' renewed motion for judgment as a matter of law or in the alternative for a new trial is **GRANTED IN PART AND DENIED IN PART**. Amended judgment will be separately entered for plaintiff Frederick Jackson in the amount of $250,000.00 against Officer Lombardi for violations of the First Amendment, and in all other respects entered for defendants and against plaintiffs.

**IT IS SO ORDERED.**

Dated: September 28, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[2] It is worth recounting the events preceding the return of the jury verdict. The jury was deliberating during the afternoon of Friday, July 23, and sent out a note that it was unable to reach a verdict. It was told to go home for the weekend and come back on Monday to deliberate further. But the jury continued to deliberate that afternoon, as was its right. Shortly thereafter, the jury reached a verdict (Dkt. No. 210). Before the verdict was read, the parties were specifically asked if there was any objection to the procedure followed. There were no objections and both sides wished to go ahead and receive the verdict.